UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAMES E. COLEMAN, JR. *on behalf of Ruben Wright*, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 19-3191 (ABJ) |
| DEPARTMENT OF THE NAVY, | ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OPINION**

On October 24, 2019, plaintiff James E. Coleman, Jr. brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against the Department of the Navy ("Navy"). Compl. [Dkt. # 1] ¶ 1. Plaintiff represents Ruben Wright, a former Marine convicted of murder in 2006, *id.* ¶ 20, in post-conviction proceedings as part of his work as the Co-Director of the Wrongful Convictions Clinic at Duke University School of Law. *Id.* ¶ 3. Plaintiff submitted a FOIA request on behalf of his client on May 11, 2016, to the Naval Criminal Investigative Service ("NCIS"), the federal law enforcement agency within the Navy, seeking video footage recorded on January 5, 2004 at Camp Lejeune Marine Corps Base in Jacksonville, North Carolina, because he believes the video is critical to the resolution of those proceedings. *Id.* ¶¶ 1, 6, 22, 38–39. The agency searched for the records but found that all relevant footage had been transferred to local authorities and that it no longer maintained a copy. *Id.* ¶ 23.

Pending before the Court is defendant's motion for summary judgment. Def.'s Mot. for Summ. J. [Dkt. # 17] ("Def.'s Mot."); Def.'s Mem. of Law in Supp. of Def.'s Mot. [Dkt. # 17]

1

("Def.'s Mem."). Plaintiff opposed defendant's motion and filed his own cross-motion for summary judgment, arguing that defendant's search for the video was inadequate. Pl.'s Cross-Mot. for Summ. J. and Opp. to Def.'s Mot. [Dkt. # 22] ("Pl.'s Cross-Mot."); Pl.'s Mem. of Law in Supp. of Pl.'s Cross-Mot. and Opp. to Def.'s Mot. [Dkt. # 22-1] ("Pl.'s Mem.").

While the Court understands the importance of the evidence to the plaintiff's efforts, and it finds the unavailability of the recording troubling, the failure to find a particular record is not what renders a search inadequate for purposes of the Freedom of Information Act, especially when there are other parties, such as the local prosecuting authorities, that may have also had custody of the material. The Court finds that defendant's search for records was adequate, and it will therefore grant defendant's motion for summary judgment and deny plaintiff's cross-motion for summary judgment.

## BACKGROUND

### I. Factual Background

Ruben Wright, plaintiff's client, was a member of the United States Marine Corps who resided at Camp Lejeune Marine Corps Base in North Carolina in 2004. Compl. ¶ 5. On January 5, 2004, retired Marine James Taulbee was murdered at his home just outside of Camp Lejeune. *Id.* ¶ 8. The murder investigation was conducted jointly by NCIS and the Onslow County Sheriff's Department ("OCSD"). *Id.* ¶ 6. During the investigation, NCIS recovered the stock of the gun used to kill Taulbee at Marine Randy Linniman's home. *Id.* ¶ 7. Linniman confessed to purchasing the murder weapon and the ammunition used and to disposing of the gun's barrel after the murder. *Id.* In addition, Linniman admitted to driving from Camp Lejeune to the Taulbee residence and back at around 4:00 a.m. on the morning of the murder. *Id.* ¶¶ 7, 18–19. However, he denied any involvement in the actual crime, and stated that he gave Wright a ride to the Taulbees' residence

2

that morning without knowledge of his true intent. *Id.* On January 20, 2006, Wright was found guilty of murdering Taulbee, and he was sentenced to life without parole. *Id.* ¶¶ 5, 20.

Plaintiff alleges that there was no physical evidence tying the crime to Wright, Compl. ¶ 20, and that the State primarily relied on photographic and video evidence purportedly showing Wright and Linniman in Linniman's car the morning of the murder, leaving through the Main Gate of Camp Lejeune and returning through the Piney Green Gate. *Id.* ¶¶ 20–21; *see id.* ¶¶ 9–19. At trial, the government turned over six photographs to the defense, labeled "Main Gate Outbound." *Id.* ¶ 17. In one of the photos, timestamped "4:06:05," the rear of Linniman's car is visible exiting Camp Lejeune. *Id.* ¶ 18. Plaintiff contends that these photos were stills captured from video recorded by two cameras at the Main Gate,[1] and that the defense never received this video footage (hereinafter, the "Main Gate video"). *Id.* The defense did receive video footage of Linniman's car returning back to the Camp through the Piney Green Gate (hereinafter, the "Piney Green Gate video"), but this video does not clearly show who was in the car. *Id.* ¶ 19.

## II. Procedural History

Plaintiff submitted his FOIA request to the Department of the Navy on May 11, 2016, requesting from NCIS "'all records pertaining to security camera videos of Zenaida Taulbee[2] and Randy Linneman [sic] leaving the Marine Corps Base, Camp Lejeune, NC on January 5, 2004.'" Compl. ¶ 22, quoting Freedom of Information Act Request, Ex. A to Compl. [Dkt. # 1-1] ("FOIA

---

1   Computer files from both gates passed through multiple investigatory stages and were at times described as "video of inbound and outbound traffic." Compl. ¶¶ 10–16; *see, e.g.*, Investigative Action 24MAR04, Ex. A to Compl. [Dkt # 1-1] ("Investigative Action I") at A-12–A-13.

2   Zenaida Taulbee was James Taulbee's wife and also a suspect during the murder investigation. *See* Incident Report #010504-151 AP309, Ex. A to Compl.[Dkt. # 1-1] at A-66–A-89.

Request") at A-9.  NCIS responded on May 19, 2016, stating that "'the requested video footage was permanently transferred to the Onslow County Sherriff's Office'" twenty-six days before the request, and "'NCIS no longer maintains a copy.'"  Compl. ¶ 23, quoting Request Closure Notice from Karen Richman, Ex. A to Compl. [Dkt. # 1-1] ("Request Closure") at A-16.

On July 17, 2016, plaintiff replied stating that OCSD had not received the full video footage because OCSD did not have any video corresponding to the timestamp of the photograph – "4:06:05" – used at trial.  Re: Richard [sic] Wright NCIS Investigation, Ex. A to Compl. [Dkt #1-1] ("Investigation Request") at A-142.  The video footage that was turned over to OCSD – the Piney Green Gate video – was also "missing large chunks of time."  *Id.* at A-143.  Plaintiff requested that the Department of the Navy investigate whether the footage turned over to OCSD had been altered or if any footage had been withheld or destroyed.  Compl. ¶ 24, citing Investigation Request at A-142–A-144.  When making this request, plaintiff assumed that the 04:06:05 photograph was captured from the cameras located at the Piney Green Gate.  *See* Investigation Request at A-143.

NCIS agreed to conduct an investigation, which it completed in March of 2017.  Compl. ¶ 25; Devinny Report of Completed Investigation, Ex. A to Compl. [Dkt. # 1-1] ("Devinny Report") at A-146.  NCIS Agent Sean Devinny explained that the time gaps in the Piney Green Gate video were due to the fact that the cameras at this gate were motion-activated, and thus did not record continuously.  Devinny Report at A-146.  He also explained that the 4:06:05 timestamped photograph did not come from the Piney Green Gate video, and that it was taken from the Main Gate cameras instead.  Therefore, it made sense that there was no Piney Green Gate video corresponding to the timestamped photograph.  *Id.*  From this, he concluded that there was no evidence that the footage had been tampered with or that parts of it had been destroyed.  *Id.*

On November 10, 2017, plaintiff appealed the response to his FOIA request, arguing that footage related to the 4:06:05 screenshot must exist, and that Agent Devinny's investigation was "improperly narrow" because it was limited to investigating the time gaps in the Piney Green Gate footage without investigating whether any Main Gate footage could be found.  *See* Compl. ¶¶ 26–27; *see also* Freedom of Information Act Agency Appeal, Ex. A to Compl. [Dkt. # 1-1] ("Appeal") at A-1–A-7.  He also sought "'a detailed account of NCIS's efforts to locate the missing footage.'"  Compl. ¶ 27, quoting Appeal at A-1.

On December 19, 2017, the appeal was granted in part and denied in part:  Director G. E. Lattin found that NCIS's search for the video had been adequate but that it had improperly limited the search's scope to only the video files, thereby potentially missing other pertinent records.  Compl. ¶ 28, citing Director Lattin Appeal Ruling, Ex. B to Compl. [Dkt. # 1-2] ("Appeal Ruling") at B-1–B-3.  The request was remanded with orders to produce any files associated with the videos.  Compl. ¶ 28.  Additionally, Director Lattin treated the request for an account of the search efforts to locate the missing footage as an entirely new and independent FOIA inquiry, which he referred to NCIS for an initial response.  Appeal Ruling at B-2–B-3.

On January 12, 2018, pursuant to the remand of the original FOIA request and in response to the newly created FOIA request, NCIS provided plaintiff with an Evidence Custody Document ("ECD"), the Management Directed Inquiry ("MDI") file which was created in the course of Agent Devinny's investigation, and a CD which contained twenty-five assorted video clips and photographs.  Compl. ¶ 29, citing Ex. C to Compl. [Dkt. # 1-3] ("Ex. C"); Ex. D to Compl. [Dkt. # 1-4] ("Ex. D").  Plaintiff alleges that these materials focused solely on issues with the already available video from the Piney Green Gate and did not appear to address the missing video from the Main Gate.  Compl. ¶¶ 30–31, quoting Ex. E to Compl. [Dkt. # 1-5] ("Ex. E").  On March 14,

2018, NCIS sent plaintiff a letter stating that it believed it had addressed all of plaintiff's concerns and that it "had produced all the relevant materials in their possession." Compl. ¶¶ 32–33, quoting Ex. F to Compl. [Dkt. # 1-6] ("Ex. F") at F-1. It therefore closed plaintiff's FOIA request. *See id.* ¶¶ 30, 33; *see* Request Closure at A-16.

Plaintiff filed a complaint with this Court on October 24, 2019. *See* Compl. In it, he alleges that NCIS did not conduct an adequate search to locate the Main Gate video footage. *Id*.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Id*. at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id*. at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

6

When considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). The court may grant summary judgment based on information provided in an agency's affidavits or declarations when they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted), and "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard*, 926 F.2d at 1200 (citation and internal quotation marks omitted).

## ANALYSIS

In this case, the only issue before the Court is whether NCIS conducted an adequate search in response to plaintiff's original FOIA request. While defendant argues that plaintiff did not exhaust his administrative remedies for the new FOIA request created by Director Lattin's decision on appeal, Def.'s Mem. at 10–12, plaintiff emphasizes that this search is not at issue. *See* Pl.'s Mem at 6 n.4, 8 n.5 ("To the extent that other portions of the [p]laintiff's back-and-forth with the Navy have resulted in administratively unexhausted claims, . . . those requests are not germane to the issue in this case."); Compl. ¶¶ 34, 38, 40, Requested Relief (c). So the Court will not address the search conducted in connection with the new FOIA request.

To prevail in a motion for summary judgment under FOIA, an agency must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999), quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990). "The question is not whether other responsive documents may exist, but whether the search itself was adequate." *Moore v.*

*Bush*, 601 F. Supp. 2d 6, 13 (D.D.C. 2009), citing *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994).  An agency can satisfy this standard by submitting "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  An agency need not search every available record system, *id.*, citing *Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C. Cir. 1986), but it should include the "rationale for searching certain locations and not others." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 92 (D.D.C. 2009).

The agency's affidavits should be "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs.*, 926 F.2d at 1200, quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).  The presumption of good faith can be overcome "if a review of the record raises substantial doubt [of the search's adequacy], particularly in view of 'well defined requests and positive indications of overlooked materials.'" *Valencia-Lucena*, 180 F.3d at 326, quoting *Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979).

The question before the Court is not whether video from the Main Gate ever existed or whether it should have been provided in discovery during the criminal case.  The question is whether the Navy's efforts to find it in its own files were adequate.  And here, it does not appear that the Navy improperly limited its search to produce only materials related to the Piney Green Gate; the search requests were broad and related to evidence in the case in general, the areas searched were appropriate, and plaintiff has not pointed to any evidence of bad faith or identified any places that should have been searched or search terms that were neglected.

In support of its motion for summary judgment, defendant submitted an affidavit from Karen Richman, the head of NCIS's Government Information Sharing Unit. *See* Decl. of Karen Richman [Dkt. # 17-1] ("Richman Decl. I"). Ms. Richman oversees NCIS's FOIA program and supervises the personnel assigned to process FOIA requests, and she avers that she has "personal knowledge of the search for records associated with the Complaint." *Id.* ¶¶ 4–5.

When the agency received plaintiff's FOIA request, it conducted an electronic search within its Records and Information Management System (RIMS), which Ms. Richman avers "is the only system used by NCIS to manage investigations" and "is accessible only by NCIS employees." Richman Decl. I ¶ 5. RIMS is searchable by the last/first name or social security number of the subject of the investigation, or by the case number. *Id.* The employee who carried out the search used the terms "WRIGHT, RUBEN" in RIMS and found Wright's murder investigation. *Id.* The agency reviewed this file, and it revealed that the relevant video files would likely be located at the NCIS Carolinas Field Office Consolidated Evidence Facility at Camp Lejeune, North Carolina. *Id.* NCIS contacted the Carolinas Field Office and requested that it conduct a physical search of its evidence storage locker. *Id.* The storage locker is organized by date of the investigation and last name of the subject. *Id.* A Carolina Field Office employee searched the 2004, 2005, and 2006 sections of the lockers, because the investigation occurred between 2004 and 2005, and the trial occurred in 2006. *Id.* No responsive records were found. *Id.*

The agency also contacted NCIS' Criminal Investigations Directorate ("Code 23") for assistance with locating the requested records. Code 23 responded by providing an Evidence Custody Document showing that "all evidence pertaining to the Ruben Wright investigation was

permanently transferred to Onslow County Sheriff's Department (OCSD) on April 14, 2016." Richman Decl. I ¶ 5.

Ms. Richman's declaration also details the search undertaken pursuant to plaintiff's request that the agency conduct an investigation into whether any video was tampered with or unlawfully withheld.[3] Richman Decl. I ¶ 8. During the investigation, the investigating officer interviewed the original case agents and learned that the Norfolk Field Office had assisted those agents with digital enhancements of the relevant files. Richman Decl. I ¶ 8. Following this lead, the Norfolk Field Office evidence locker and computer systems were searched with Wright's name for the years 2004, 2005, and 2006, and one CD was located with twenty-five files, which was provided to plaintiff. *Id.* Ms. Richman avers that she "reviewed the NCIS investigation of Mr. Wright and found that no other NCIS field office nor NCIS Headquarters had any involvement in his case" before ending the search. *Id.*

The agency also submitted a supplemental declaration in which Ms. Richman explained that NCIS policy dictates that "each evidence locker/facility are inventoried annually." *See* Second Decl. of Karen Richman [Dkt. # 26-2] ("Richman Decl. II") ¶ 9. This inventory "consists of reconciliation of the Evidence Log against the Active Evidence Custody Record and a visual accounting of each item or container." *Id.* Since the investigation into evidence tampering in

---

3     Though the adequacy of this search is not at issue, courts in this Circuit generally consider the results of subsequent searches to supplement and potentially remedy an inadequate initial search. *See Meeropol*, 790 F.2d at 953 (". . . [W]hat is expected of a law-abiding agency is that it admit and correct error when error is revealed."); *Am. Oversight v. U.S. Dep't of Justice*, 401 F. Supp 3d 16, 28 (D.D.C. 2019) ("A myopic focus on the reasonableness of the initial failures, divorced from the agency's remedial efforts to cure them, would erode that principle."); *cf. People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affairs*, 800 F. Supp. 2d 173, 179 (D.D.C. 2011) (". . . [I]t is well settled in this Circuit that the subsequent production of responsive documents can remedy inadequate searches.").

2017, "there were multiple inventories of the evidence facilities at both the Norfolk and Carolina Field Offices, none of which produced the requested evidence." *Id.*

Furthermore, on May 19, 2020, in response to arguments that plaintiff raised in his cross-motion for summary judgment, the agency conducted additional searches in RIMS using the names and social security numbers of "Linniman, Randy" and "Taulbee, Zenaida." Richman Decl. II ¶ 10; *see* Pl.'s Mem. at 12–13. Neither name yielded any additional records. Richman Decl. II ¶ 10.

NCIS also directed that a search be conducted at Camp Lejeune itself, and it submitted another affidavit from Charles Clements, the head FOIA Coordinator and Privacy Act Manager at Marine Corps Installation-East aboard Marine Corps Base Camp Lejeune. Decl. of Charles Clements [Dkt. # 26-1] ("Clements Decl.") ¶ 1. The Marine Corps Installation-East "is the Marine Corps unit that commands and is responsible for facilities, logistics, and administrative support for all Marine Corps bases, posts, and stations east of the Mississippi River." *Id.* ¶ 3. One of Clements' employees conducted an electronic search of the "Combat Camera web-based archive system[ ] and the Defense Visual Information Distribution Service (DVIDS)" which is the Defense Department's "repository for media and public affairs material." *Id.* ¶ 5. The search terms "LINNIMAN," "TAULBEE," "DEVINNY," "VOUSBOUKIS," "FOX," "WRIGHT," and "JANUARY 5, 2004" were used, and no responsive records were located. *Id.* A physical search of the Combat Camera office was also conducted, using the same terms above to identify any relevant documents, and it yielded no responsive records. *Id.* Clements also directed a search within the records system maintained at the Camp Lejeune Provost Marshall's Office using the above search terms, and this did not produce any responsive records either. *Id.* ¶ 6.

These affidavits show that the search undertaken by defendant was reasonably calculated to uncover responsive records. The search is described with reasonable specificity, and it identifies the search terms used, locations searched, and provides a rationale for each database and location searched. Richman Decl. I ¶¶ 5, 8. The agency avers that no other locations or offices were involved in Wright's case. *Id.* ¶ 8.

Plaintiff argues that because defendant effectively concedes that the Main Gate video did exist at some point, Def.'s Reply in Supp. of Mot. for Summ. J. [Dkt. # 26] ("Def.'s Reply") at 2, the Navy's failure to produce the footage or to explain why it cannot do so establishes that the search must have been inadequate. Pl.'s Mem. at 10. This position is not supported by the law in this Circuit. "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003), citing *Steinberg*, 23 F.3d at 551. Indeed, the Court of Appeals has held that "the failure of an agency to turn up one specific document in its search does not alone render a search inadequate . . . . After all, particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them." *Id*.

For example, in *Valencia-Lucena v. U.S. Coast Guard*, the plaintiff sought certain entries from a ship's logbook that had been used as evidence against him at his criminal trial, 180 F.3d at 324–325, much like the photos allegedly taken from the Main Gate video and used against Wright at trial. The D.C. Circuit reiterated "that the adequacy of a search is separate from the question of whether the requested logbook entries are found," and while the Court held that the government's search was inadequate because it had failed to search a likely location of the requested documents,

12

the Court did not rely upon the likely existence of the records sought as a basis for its decision. *Id.* at 326–327.

Here too, plaintiff cannot rely on the fact that NCIS has not discovered the missing footage to prove that its search was inadequate. *See, e.g.*, *Meeropol*, 790 F.2d at 952–53 ("[A] search is not unreasonable simply because it fails to produce all relevant material."); *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983), quoting *Perry v. Block*, 684 F.2d 121, 128 (D.C. Cir. 1982) ("'The issue is *not* whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate.'"); *Dean v. U.S. Dep't of Justice*, 141 F. Supp. 3d 46, 49 (D.D.C. 2015) (finding that the agency's inability to find a record used against plaintiff at trial did not render the search inadequate).

Plaintiff argues that NCIS should have searched additional repositories, although he does not identify which repositories should have been searched. He points out that the Navy searched the Camp Lejeune Provost Marshall's Office in response to his cross-motion for summary judgment, and suggests that this shows that "the Navy may be aware of additional repositories that might prove fertile searching ground[,]" Pl.'s Reply in Supp. of Cross-Mot. for Summ. J. [Dkt. # 29] ("Pl.'s Reply") at 2, citing *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998). In *Campbell*, the D.C. Circuit explained that while an agency has discretion to conduct a standard search in response to a FOIA request, "it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry." 164 F.3d at 28. But there is no basis to conclude that the Navy did not heed that direction; both gates were at Camp Lejeune, so the example plaintiff cites does little to suggest that the Navy left an obvious stone unturned. Instead, it suggests that the agency acted appropriately and expanded its search –

which was already directed at all video files – as indicated.  Plaintiff has not established that there was a "lead" that arose during the search that was ignored.

Furthermore, the agency has averred that no other repositories for relevant documents exist.  *See* Richman Decl. II ¶¶ 5, 8 ("RIMS is the only system used by NCIS to manage closed investigations" and "no other NCIS field office nor NCIS Headquarters had any involvement in his case").  Defendant searched the Provost Marshall's Office as part of what appears to be a good faith effort to respond to plaintiff's concerns.[4]

Finally, plaintiff suggests that the adequacy of the search is undermined by the fact that NCIS Agent Vousboukis was not interviewed.  Pl.'s Reply at 3.  The record shows that Agent Vousboukis interacted with the Main Gate and Piney Green Gate video files throughout the investigation, Compl. ¶¶ 14–16; *see* Investigative Action I at A-12; Forensic Examination Request, Ex. A to Compl. [Dkt. # 1-1] at A-14; Investigative Action 26MAY04, Ex. A to Compl. [Dkt. # 1-1] ("Investigative Action II") at A-131, and that he testified at Wright's trial regarding the contents of the Main Gate photos.  Compl. ¶ 18, citing Trial Transcript, Ex. A to Compl. [Dkt. # 1-1] at A-22.

When an agency's FOIA searches fail to produce records that are sought with particularity, "agency personnel should be contacted if there is a close nexus . . . between the person and the particular record."  *Valencia-Lucena*, 180 F.3d at 328.  To satisfy this standard, a plaintiff must provide "'strong evidence' . . . to show how [certain Agents] 'might have been helpful' in locating

---

4   If anything, the fact that this search returned no responsive records may serve to strengthen defendant's assertion that the previously searched repositories were the only relevant ones.  *See Heffernan v. Azar*, 317 F. Supp. 3d 94, 107 (D.D.C. 2018) (reasoning that searches of expanded scope suggested a "'stronger . . . basis for accepting the integrity of the search'"), citing *Airaj v. U.S. Dep't of State*, No. 15-983, 2016 U.S. Dist. LEXIS 55750, *20 (D.D.C. Apr. 27, 2016).

the [sought record]." *Dean*, 141 F. Supp. 3d at 50, quoting *Iturralde*, 315 F.3d at 315.  An inquiry is not required when there are indications that it "would be fruitless . . . because the storage of the [record] was controlled by other persons or by internal procedures." *Valencia-Lucena*, 180 F.3d at 328.

Agent Vousboukis's connection to the records sought does not satisfy the "close nexus" standard.  While there is evidence in the record that he viewed the Main Gate video footage, and then sent it to a laboratory in Norfolk, Virginia for enhancement, *see* Investigative Action at A-12–A-13 (sending files to the Norfolk Field Office for enhancement); *id.* at A-14 (forensic examination request), he is not alleged to have had any responsibility in creating, storing or maintaining the video files.  *See Valencia-Lucena*, 180 F.3d at 328 (requiring inquiry of Captain who possessed and brought to trial the relevant record); *Jackson v. U.S. Attorney's Office*, 362 F. Supp. 2d 39, 42 (D.D.C. 2005) (requiring inquiry of individuals who created the document and told plaintiff about it).

Furthermore, during the agency's investigation in response to plaintiff's complaint that the footage had been tampered with, a "case agent" who "sent the videos to be enhanced" to Norfolk *was* interviewed, although this person's name is redacted pursuant to a FOIA Exemptions 6 and 7(C).  *See* Ex. D at D-10.  This individual could not recall many details regarding the videos, due to the amount of time that has passed, although he did recall that he sent them either to the "NCIS tech shop" in Norfolk, VA or to the Combat Camera shop at Camp Lejeune.  *Id.*  Consistent with this information, the agency searched both these locations and no responsive records were recovered.  Richman Decl. I ¶ 8; Clements Decl. ¶ 5.  Given that NCIS conducted interviews of agents on the case at the time the investigation occurred, and it has since followed up on the

information gathered from those interviews without finding the Main Gate footage, it appears from the record that further interviews are unlikely to reveal additional information.

## CONCLUSION

Defendant has conducted an adequate search that was reasonably calculated to uncover records responsive to plaintiff's FOIA request. While plaintiff is understandably frustrated by the roadblocks he has faced in tracking down this record, defendant has satisfied its burden under FOIA. Thus, defendant's motion for summary judgment will be granted, and plaintiff's cross-motion for summary judgment will be denied.

AMY BERMAN JACKSON
United States District Judge

DATE: September 16, 2020